UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AZIZ M.A. AL-MUQALEH,

                Plaintiff,                        Civil Action No. 15-10454
                                                              Honorable Robert H. Cleland
v.                                                Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]**

        Aziz M.A. Al-Muqaleh ("Al-Muqaleh") commenced this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties filed motions for summary judgment,[1] which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

        For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Al-Muqaleh is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's motion for summary judgment [18] be GRANTED, Al-Muqaleh's motion for summary judgment [16] be DENIED and, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

---

[1] Al-Muqaleh also filed a response to the Commissioner's motion for summary judgment. [19].

## II.      REPORT

### A.      Procedural History

On April 26, 2012, Al-Muqaleh filed the instant applications for DIB and SSI, alleging disability onset dates of February 26, 2010[2] and April 26, 2012, respectively. (Tr. 118-130). The claims were initially denied on August 29, 2012. (Tr. 74-81). Thereafter, Al-Muqaleh filed a timely request for an administrative hearing, which was held on August 22, 2013 before ALJ Oksana Xenos. (Tr. 24-40). Al-Muqaleh, who was represented by non-attorney representative Lisa Asker, testified at the hearing, as did vocational expert David Halwarda. (*Id.*). In a written decision dated September 7, 2013, the ALJ determined that Al-Muqaleh is not disabled. (Tr. 9-20). On December 9, 2014, the Appeals Council denied review. (Tr. 1-4). Al-Muqaleh filed for judicial review of the final decision on February 4, 2015. (Doc. #1).

### B.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

---

[2] The ALJ's decision mistakenly states that "the claimant alleged disability beginning in April 26, 2012" in both his DIB and SSI applications. (Tr. 9). Al-Muqaleh raises no objection to this discrepancy and any error would be appear to be harmless in view of the ALJ's consideration of the medical evidence that pre-dated April 26, 2012.

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240, at *21 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).   "The burden of proof is on the claimant throughout the first four steps . . . [i]f the analysis [then] reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.      Background

#### 1.      *Disability and Function Reports*

In an undated disability report, Al-Muqaleh indicated that he suffers from high blood pressure, back pain, mental conditions, stress, high cholesterol levels, and asthma. (Tr. 160).  Al-Muqaleh reported that he stopped working on January 4, 2010, as a result of these conditions. (*Id.*).  With respect to his education level, Al-Muqaleh completed the seventh grade but never

3

pursued any further studies. (Tr. 161).  Prior to stopping work, Al-Muqaleh was employed as a self-described factory worker. (*Id.*).  Al-Muqaleh stated that Mahmoud Rahim, M.D., treated him for the foregoing physical and mental impairments. (Tr. 163).  At the time of the report, Al-Muqaleh was taking several medications, including Advair (for asthma), Citalopram (for stress), Flomex, Gemfirozil (for cholesterol), Ibuprofen (for pain), Nasonex (for asthma), Vicodin (for pain), Zestril (for high blood pressure), and Zyprexa (for stress). (*Id.*).

In a function report dated May 18, 2012, Al-Muqaleh stated that he lives in an apartment by himself. (Tr. 186).  He suffers from back pain, disk pain, shoulder pain, neck pain, and depression. (*Id.*).  When asked to describe his daily activities, Al-Muqaleh indicated that he eats and watches television throughout the day. (Tr. 187).  His pain interferes with his sleep and he reported that he requires assistance with dressing, bathing, grooming, preparing meals, and using the bathroom. (*Id.*).  Al-Muqaleh noted that his friends must remind him to take his medications and that he needs their help with all of his household chores. (Tr. 188).  He does not prepare his own meals and primarily relies upon fast food. (*Id.*). Al-Muqaleh reported that he goes outside once a day by himself; he goes shopping with a friend two times during the week; and he generally avoids driving on account of his neck, back, and shoulder pain. (Tr. 189).  He is able to pay bills, count change, handle a savings account, and use a checkbook. (*Id.*).

Regarding social activities, Al-Muqaleh reported that he generally does not spend time with other people, he likes "to be alone," and he does not "trust anyone." (Tr. 190-91).  He indicated that he does not visit his family or friends because he suffers from depression. (Tr. 191).  When asked to identify functions impacted by his condition, Al-Muqaleh checked lifting, standing, sitting, stair climbing, completing tasks, using his hands, and getting along with others. (*Id.*).  He estimated that he can walk for half a block before needing to stop and rest for 15

4

minutes and that he can pay attention to a specific task for no longer than 10 minutes. (*Id.*).  Al-Muqaleh indicated that he has difficulty following written instructions; he is confused by spoken instructions; he does not handle stress well; he does not like changes in routine; and he is afraid of other people. (Tr. 192).  Al-Muqaleh stated that he requires a cane to ambulate and he consistently uses the same medications that he listed in his disability report.[3] (Tr. 192-93).

### 2. *Al-Muqaleh's Testimony*

At the time of the August 22, 2013 hearing before the ALJ, Al-Muqaleh testified through an Arabic interpreter. (Tr. 26).  Al-Muqaleh stated that lives by himself and that his wife and children live in Yemen. (Tr. 28).  He possesses the equivalent of a seventh-grade education. (*Id.*).  Al-Muqaleh reported that he suffers from depression, back, arm, and neck pain and rheumatism. (Tr. 29).  He testified that, in January 2010, his employer terminated him from his last job as a machine operator on account of his conditions. (Tr. 30).  Since he stopped working, Al-Muqaleh indicated that, "I sit at home.  At night I can't sleep.  In the day time I sleep a little.  I'm in bad condition, my arm is [*sic*] and I can't work." (*Id.*).  Al-Muqaleh indicated that his neighbor prepares all of his meals for him; other people assist him by purchasing groceries for him; he does not drive a car or use public transportation because he suffers from dizziness; and he only leaves his house for doctors' appointments. (Tr. 31-32).

With respect to his physical limitations, Al-Muqaleh reported that his worst pain is in his right arm, back, and neck. (Tr. 31).  He stated that he can sit in one spot for up to 20-30 minutes; he can stand continuously for 5-10 minutes; he can walk for 5-10 minutes for "the distance of a hall"; he can carry up to two pounds in his left hand and nothing in his right hand; he has

---

[3] The record reflects that Al-Muqaleh's friend, Mohamed Ali, drafted a third-party function report dated May 18, 2012. (Tr. 198-205).  His report is largely consistent with Al-Muqaleh's statements.

problems with fingering in both of his hands; and he must ambulate with a cane at all times. (Tr. 31-33).  Al-Muqaleh testified that his landlord attends to most of the household chores and that his relatives take his clothes to the laundry. (Tr. 34).

Regarding his psychological symptoms, Al-Muqaleh testified that he does not "like . . . mixing with people at all" and that he has spent the last four years secluded in his apartment. (Tr. 33).  He noted that his relatives call him on the phone, but he does not visit with them socially. (*Id.*).  Al-Muqaleh reported that he hears voices throughout the day and that he does not trust anyone. (*Id.*).

### 3.    Medical Evidence

The Court has thoroughly reviewed the record, and will discuss the relevant medical evidence within the analysis portion of this Report and Recommendation.

### 4.    Vocational Expert's Testimony

David Halwarda testified as an independent vocational expert ("VE"). (Tr. 35-40).  The ALJ asked the VE to imagine a claimant of Al-Muqaleh's age, education, and work experience, who was limited to light work and:

> "cannot climb ladders, ropes or scaffolds, can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl, should avoid concentrated exposure to temperature extremes, humidity and vibration, should avoid concentrated exposure to fumes, odors and noxious gases, and is limited to unskilled simple repetitive work with minimal changes in the work setting and occasional contract with the general public, coworkers and supervisors."

(Tr. 35).  The VE stated that the hypothetical individual would be able to perform Al-Muqaleh's past relevant work according to the Dictionary of Occupational Titles ("DOT") and according to how Al-Muqaleh actually performed his work. (*Id.*).  Alternatively, the VE noted that the hypothetical individual could also perform work as a production assembler (10,000 jobs

statewide); inspector/tester (5,500 jobs statewide); and hand packager (8,800 jobs statewide). (*Id.*).

The ALJ then inquired whether a hypothetical individual limited to frequent handling and fingering and occasional overhead reaching with the right upper extremity would still be able to perform Al-Muqaleh's past relevant work. (Tr. 36). The VE responded that the hypothetical individual could perform Al-Muqaleh's past relevant work, but that the availability of the other job titles would decrease by 20 percent. (*Id.*). The ALJ asked the VE whether any jobs would remain available if the hypothetical individual could only perform work at the sedentary exertional level. (*Id.*). The VE testified that the production assembler (3,400 jobs statewide), inspector/tester (700 jobs statewide), and machine operator/tender positions (restricted to no exposure to any hazards, 1,300 jobs statewide) would remain available. (Tr. 36-37). The ALJ then asked the VE to envision a hypothetical individual who would be off-task up to 20 percent of the workday and unable to sit, stand and/or walk a total of eight hours five days a week "on a regular and continuing basis." (Tr. 37). The VE responded that there were no available jobs for an individual with such a residual functional capacity and that his testimony was consistent with the DOT. (*Id.*).

On cross-examination, the non-attorney representative confirmed that the VE correctly classified Al-Muqaleh's past relevant work as light and that he could only lift a maximum of 20 pounds. (Tr. 38).

## D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Al-Muqaleh is not disabled under the Act. At Step One, the ALJ found that Al-Muqaleh has not engaged in

substantial gainful activity since April 26, 2012, the alleged onset date.[4] (Tr. 11).  At Step Two, the ALJ found that Al-Muqaleh has the severe impairments of spine disorder, osteoarthritis, carpal tunnel syndrome, asthma, and depression with psychotic features. (*Id.*).  At Step Three, the ALJ found that Al-Muqaleh's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 12-13).  The ALJ then assessed Al-Muqaleh's residual functional capacity ("RFC"), concluding that he is capable of performing light work with the following limitations: unskilled, simple, repetitive work with only occasional contact with the general public, coworkers, and supervisors, and minimal changes in the work setting; no climbing ladders, ropes, or scaffolds; occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching and crawling; frequent handling and fingering; occasional reaching overhead with the right upper extremity; avoidance of concentrated exposure to temperature extremes, humidity, vibration, fumes, odors, and noxious gases. (Tr. 13).

At Step Four, the ALJ determined that Al-Muqaleh is able to perform his past relevant work as a production assembler, which is classified as unskilled, light work. (Tr. 19).  As a result, the ALJ concluded that Al-Muqaleh is not disabled under the Act. (Tr. 19-20).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

---

[4] *See* fn.2, *supra*.

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Al-Muqaleh v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (stating that "an ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."

9

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Al-Muqaleh argues that the ALJ's RFC assessment, which found that he could perform light work with various additional exertional and non-exertional limitations, is flawed because "the ALJ did not properly assess the evidence of record, and in the process ignored or failed to observe controlling regulations and rulings."  (Doc. #16 at 12).  However, he specifically only challenges the manner in which the ALJ addressed the various medical opinions in the record.  (*Id.* at 12-15).  The Court will address them each, in turn.

### 1.    Treating Physician Mahmoud Rahim, M.D.

Social Security regulations require ALJs to give treating source opinions controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" – such weight is only appropriate if the opinion is well-supported and consistent with the record as a whole.  Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *5 (Jul. 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (stating that "[t]reating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of

the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (requiring the ALJ to provide "good reasons" for the weight given to treating source opinions).

Al-Muqaleh argues that "the ALJ disregarded the opinions of [his] treating physician, Dr. [Mahmoud] Rahim, without acknowledging the rule noted above or in any way discussing its application.[5]  Instead, she wrote only, 'The undersigned finds that such opinion is not well supported by the objective and other substantial evidence of record and gives it limited weight. Furthermore, findings of disability are within the special purview of the undersigned' (Tr. 15)." (Doc. #16 at 13).  Al-Muqaleh's argument is flawed in numerous respects.

The Court begins by clarifying the "opinions" in issue because, while Al-Muqaleh identified Dr. Rahim's "opinions" in his factual recitation, he failed, in his analysis, to specify an opinion of Dr. Rahim that the ALJ supposedly improperly rejected.  (Doc. #16 at 5, 7, 13-14).[6] The Commissioner properly summarized Dr. Rahim's opinions as follows: "In a brief January 2012 letter, [Dr. Rahim] stated [Al-Muqaleh] had shoulder and back pain, and carpal tunnel

---

[5] Contrary to Al-Muqaleh's assertion, the ALJ noted that he "has treated with [Dr. Rahim], his primary care physician, since February 2007 for complaints of right shoulder pain, knee pain, neck pain, low back pain, and right hand numbness."  (Tr. 14).  Thus, the ALJ clearly did acknowledge both the length and nature of Dr. Rahim's treating relationship with Al-Muqaleh.

[6] Instead, Al-Muqaleh seemed to conflate Dr. Rahim's supposed "opinions" with his "diagnoses." (*Id.* at 16 ("there is plenty of objective record evidence to support each of Dr. Rahim's diagnoses.")).  But Al-Muqaleh's focus on the doctor's diagnoses is misplaced because "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."  *McKenzie v. Comm'r of Soc. Sec.*, No. 99–3400, 2000 WL 687680 at *5 (6th Cir. May 19, 2000).

syndrome, and was therefore disabled (Tr. 452).  Later, in an August 2012 letter, Dr. Rahim

listed [Al-Muqaleh's] symptoms, diagnoses, and test results, but offered no opinion on severity

or limitations (Tr. 453)."  (Doc. #18 at 12).  Thus, the only "opinion" offered by Dr. Rahim that

actually speaks to Al-Muqaleh's functional limitations is his conclusion that Al-Muqaleh was

"totally and permanently disabled."  (Tr. 452).  The ALJ's rejection of that opinion (Tr. 15)

cannot constitute reversible error because, as Al-Muqaleh acknowledges, "the ALJ is not bound

by [such] conclusions of disability."  (Doc. #16 at 13).  *See also Curler v. Comm'r of Soc. Sec.*,

561 F. App'x 464, 472 (6th Cir. 2014) ("disability determinations are the prerogative of the

Commissioner.").

The Court also sees no violation of the treating physician rule in terms of the ALJ's

discussion of the medical records from Dr. Rahim's office.  The ALJ reviewed Dr. Rahim's

treatment notes, and properly concluded that they did not support the doctor's conclusion that

Al-Muqaleh "is totally and permanently disabled."  (Tr. 15).  For instance, a January 2010 MRI

of Al-Muqaleh's right shoulder showed acromioclavicular joint osteoarthritis with evidence of

"early impingement," an interstitial tear of the musculotendinous junction of the supraspinatus,

and a small full-thickness tear of the posterior supraspinatus tendon with a mild reactive edema

in the greater tuberosity. (Tr. 454).  A January 2010 MRI of the lumbar spine revealed a diffuse

disc bulge at L4-L5 with mild effacement of the thecal sac, no spinal stenosis, moderate

narrowing of the bilateral neural foramina, and a diffuse disc bulge at L5-S1 coupled with

bilateral facet joint hypertrophy. (Tr. 455).  The MRI indicated normal vertebral alignment and

no evidence of spinal canal stenosis or compromise at any lumbar level. (*Id.*).  The ALJ also

noted a MRI of the cervical spine conducted in February 2011, which exhibited only mild disc

protrusions and bulging at C3-C4, C5-C6, and C6-C7 with "[n]o definite abnormalities." (Tr.

248).   And a March 2011 EMG and nerve conduction study showed bilateral carpal tunnel syndrome, but otherwise only "mild peripheral sensory neuropathy at upper and lower extremities." (Tr. 371).  The severity of Dr. Rahim's carpal tunnel diagnosis was also belied by a later consultative examination report finding that Al-Muqaleh had no joint deformities and that his handgrip and pinch were "satisfactory bilaterally." (Tr. 437).

In short, while the ALJ could have more fully explained her reasoning, her logic was clear enough; the objective medical evidence did not exhibit the level of severity that would be expected for a claimant who is "totally and permanently disabled."   Indeed, this conclusion should come as no surprise to Al-Muqaleh, as he admits that "none of these objective tests may have yielded evidence of a single severe issue…" (Doc. # 16 at 14).

Al-Muqaleh counters that the ALJ's real error with respect to her analysis of Dr. Rahim's opinions was failing to consider "the *combined* impact" of his impairments.  (*Id.* at 14 (emphasis in original); 20 C.F.R. § 404.1523; *see also White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009) (stating that "[o]nce one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe.")).  However, this argument fails because, as noted above, Dr. Rahim never actually opined on Al-Muqaleh's functional limitations, but instead merely provided diagnoses and a conclusion that he was "totally and permanently disabled."

Finally, in summing up his argument, Al-Muqaleh asserts, "When the totality of the evidence is accounted for *in combination*, it cannot be said that a finding that a claimant is disabled is unsupported by substantial evidence where that individual has problems with his shoulder, arm, neck, low back, and knee, not to mention psychiatric issues."  (Doc. #16 at 15 (emphasis in original)).  But this misses the mark because disability determinations do not turn

on whether the claimant merely experiences "problems" with certain body parts. Again, "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *McKenzie*, 2000 WL 687680 at *5.

### 2. Consultative Examiner E. Montasir, M.D.

The ALJ's RFC findings are consistent with – and actually more restrictive than – those identified by Dr. E. Montasir, M.D. in his August 11, 2012 consultative examination report. (Tr. 435-38).[7]  Dr. Montasir observed that Al-Muqaleh exhibited a slow, normal gait and a limited range of motion in his neck without any evidence of adenopathy or thyromegaly. (Tr. 436). His chest was clear on auscultation bilaterally with no rales, wheezing, or rhonchi. (Tr. 437). His asthma condition appeared to be mild due to the limited need for his inhaler. (*Id.*). A motor examination indicated fair muscle tone with no flaccidity, spasticity, or paralysis. (*Id.*). Although Al-Muqaleh presented with a splint on his right wrist with a positive Tinel's test, as noted above, he had no joint deformities and his handgrip and pinch were "satisfactory bilaterally." (*Id.*). He also demonstrated some limited range of motion in his right shoulder and excursion of the lumbar spine. (*Id.*). As for his motor coordination, Al-Muqaleh was able to "ambulate reasonably well" without the assistance of a cane, he could tandem walk, and he was able to get on and off the examination table by himself. (*Id.*). There was no evidence of muscle weakness or joint instability, and while a straight leg raising test resulted in thigh and knee pain, Al-Muqaleh did not exhibit any back pain. (*Id.*). There was some fatigue with repetitive activity, "particularly with the right shoulder limitation." (*Id.*).

---

[7] Dr. Montasir concluded that Al-Muqaleh was capable of "pushing, pulling and lifting … to about 25 pounds" (Tr. 437), but the ALJ limited Al-Muqaleh to "light work," which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

After examining Al-Muqaleh, Dr. Montasir opined that:

> Limitations will be carrying with his right handed [*sic*]. . . Working overhead would be limited. The patient would be limited from climbing ropes, ladders, or scaffolding. Pushing, pulling, and lifting should be reasonable to about 25 pounds. His walking, climbing stairs should be without difficulties. Manipulations in general should be without difficulties. There is possible fatigue in the right hand secondary to carpal tunnel. Tinel's and Phalen's tests were positive in the right hand, however the grip was not affected but easy fatigability could be a factor in the right hand which is according to the patient about 15 minutes and after that he feels effect of the numbness and pain in the right wrist.

(Tr. 437-38).

The ALJ incorporated most of these limitations into her RFC assessment. For instance, the ALJ limited Al-Muqaleh to occasional reaching overhead with his right upper extremity; no climbing ladders, ropes or scaffolds; occasional climbing of stairs and ramps, occasional balancing stooping, kneeling, crouching, and crawling; and frequent handling and fingering. (Tr. 13). The ALJ even included extensive environmental limitations that Dr. Montasir had not suggested, and as noted above, *supra* fn. 7, limited his lifting, pushing and pulling more significantly than had Dr. Montasir. (*Id.*). Moreover, contrary to Al-Muqaleh's self-reported complaints, there are no objective medical findings in the record that would support a limitation restricting him to only occasional handling and fingering or requiring the use of a cane.[8]

### 3.    State Agency Medical Consultant, Sonia Ramirez-Jacobs, M.D.

Next, the ALJ appropriately considered the August 24, 2012 evaluation of the state agency medical consultant, Sonia Ramirez-Jacobs, M.D. (Tr. 48-50). Dr. Ramirez-Jacobs opined that Al-Muqaleh could occasionally lift 20 pounds; stand or walk for six hours in an eight-hour

---

[8] In his reply brief, Al-Muqaleh notes that "Dr. Montasir also reported that [he] might need a cane if walking beyond 2 blocks." (Doc. #19 at 6). However, the more salient portion of this particular medical record is that when specifically asked, "Does *clinical evidence* support the need for a walking aid?," Dr. Montasir answered "No." (Tr. 440 (emphasis added)).

15

day; sit for six hours in an eight-hour day and occasionally climb stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. 49).   Dr. Ramirez-Jacobs also noted that Al-Muqaleh should avoid environmental conditions such as concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. 50).   The ALJ gave this opinion "significant weight" as reflected in her decision that Al-Muqaleh could perform light work with significant environmental limitations. (Tr. 13, 16).

Citing to *Jones v Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) and *Shelman v Heckler*, 821 F.2d 316, 321 (6th Cir. 1987), Al-Muqaleh argues that the ALJ erred in giving "significant weight" to Dr. Ramirez-Jacobs' opinion because "opinions of a nonexamining physician are not entitled to significant weight if contrary to the opinions of treaters and others who actually examined the claimant."  (Doc. #16 at 17).   However, this is an overgeneralization of these cases and the law.  As this Court has previously held:

> While, as a general matter, "more weight [is given] to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not," 20 C.F.R. § 404.1527(c)(1), the ALJ "was not required to give relatively less weight to the agency source opinion[ ] simply because [it was] contrary to the opinion of [a treating source]."  *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011).  This is because the ALJ must, of course, also consider (among other factors) the supportability of each opinion, and its consistency with the medical records and other evidence.  20 C.F.R. 404.1527(d)(3), (4).  * * * *See* SSR 96–6p, 1996 SSR LEXIS 3, *6 (noting that "the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record" and that "[i]n appropriate circumstances, [such] opinions ... may be entitled to greater weight than the opinions of treating or examining sources"); *Helm*, 405 F. App'x at 1002 (noting that "[o]nce the ALJ determined not to accord [the treating source] 'controlling weight,' the ALJ was required only to provide 'good reasons' for giving greater weight to the opinions of agency sources," and such "opinions need only be 'supported by evidence in the case record' " to potentially receive such greater weight).

*Ausbrooks v. Astrue*, 2013 WL 3367438, at *17 (E.D. Mich. Jul. 5, 2013).

Al-Muqaleh also argues that the ALJ should not have given significant weight to Dr. Ramirez-Jacobs's opinion because she did not have access to the results of several diagnostic tests that post-dated her evaluation, and she cites to *Jones v. Astrue*, 808 F. Supp. 2d 993 (E.D. Ky. 2011), for the similar proposition that "opinions of a non-examining source who did not review the complete record are not a sufficient basis to support a decision denying benefits." (Doc. # 16 at 17-18).   In response, the Commissioner correctly notes that the holding in *Jones* has since been limited by an opinion from the same district court in *Gallion v. Comm'r Soc. Sec.*, No. 14-81, 2015 U.S. Dist. LEXIS 66509 (E.D. Ky. Apr. 15, 2015).   In *Gallion*, the district court consigned *Jones'* precedential value to circumstances "where the non-examining source was without a significant portion of the record" and the ALJ failed to review the record evidence submitted after the non-examining opinion was issued. *Id.* at *23-24.   *Gallion's* limitation of *Jones* is applicable in the context of this case because: (1) Dr. Ramirez-Jacobs had access to most of the medical record presented to the ALJ; (2) the ALJ considered the medical evidence proffered after Dr. Ramirez-Jacobs issued her August 24, 2012 evaluation; and (3) Dr. Ramirez-Jacobs had more of the medical record available to her than Dr. Rahim (as her evaluation post-dated Dr. Rahim's January 11, 2012 and August 15, 2012 findings), the doctor whose opinion Al-Muqaleh insists should be afforded controlling weight.   Moreover, the Sixth Circuit has made clear that "[t]here is no categorical requirement that the non-treating source's opinion be based on a complete or more detailed and comprehensive case record" than that of a treating source. *Helm*, 405 F. App'x at 1002 (internal quotation marks omitted).

In sum, the mere fact that certain evidence post-dates Dr. Ramirez-Jacobs's opinion does not mean the ALJ could not properly consider and weigh it.   At bottom, the Commissioner must show that the ALJ's decision is supported by substantial evidence in the record, and, for the

reasons discussed herein, that support goes well beyond Dr. Ramirez-Jacobs's opinion.

4.      *Consultative Psychological Examiner Mitchell Solomon, Ph.D.*

With respect to Al-Muqaleh's mental limitations, the ALJ considered the August 17, 2012 mental status examination of Mitchell Solomon, Ph.D. (Tr. 459-62).   During the examination, Dr. Solomon observed that Al-Muqaleh's hygiene and grooming were poor, but that he was friendly and cooperative. (Tr. 460).  His mood was sad and depressed but he denied any suicidal ideations or symptoms of mania or hypomania. (*Id.*).   Even still, Al-Muqaleh's thoughts were spontaneous and logical without any evidence of obsessions or delusions. (*Id.*). His thinking was appropriate and organized and he denied experiencing racing thoughts. (*Id.*). Although Al-Muqaleh indicated that he suffered from auditory hallucinations and paranoia, and he exhibited difficulty maintaining attention and concentration, Dr. Solomon noted that Al-Muqaleh's thinking was "very concrete." (*Id.*).   The doctor assigned Al-Muqaleh a Global Assessment Functioning[9] ("GAF") score of 55 and marked his prognosis as "fair." (Tr. 461). The doctor indicated that Al-Muqaleh "was oriented and he was able to perform simple arithmetic." (*Id.*). He found that Al-Muqaleh "should be able to manage any benefit funds independently." (Tr. 462).   Dr. Solomon additionally noted that Al-Muqaleh's "attention and concentration, short and long-term memory, ability to think abstractly, basic vocabulary, and fund of general information are at least mildly impaired." (Tr. 461-62).  He ultimately concluded that Al-Muqaleh's "ability to work will be significantly impacted by his ability to manage both

---

[9] "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning, whereas scores between 41 and 50 represent serious symptoms or serious impairment in these areas." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 436 n.1 (6th Cir. 2012) (citations omitted).

physical/health problems and mood symptoms." (Tr. 462).

Al-Muqaleh asserts that the ALJ "disregarded all" of the above findings. A closer reading of the ALJ's RFC assessment, however, reveals that she actually credited most of Dr. Solomon's findings, and utilized them in formulating the RFC. Indeed, the ALJ noted in her RFC assessment, "[b]ecause of his alleged concentration difficulties, aversion to other people, and difficulties handling change; the claimant is limited to unskilled, simple, repetitive work with only occasional contact with the general public, coworkers, and supervisors and minimal changes in work setting." (Tr. 19). Thus, while the ALJ could have been more precise in criticizing Dr. Solomon's use of the phrase "significantly impacted" to describe how Al-Muqaleh's mental impairments affect his functional capacity, at bottom, the Commissioner is correct to say that "Dr. Solomon assessed 'significant' mental limitations, and the ALJ assessed significant mental RFC limitations." (Doc. #18 at 22).

### 5. *Treating Psychiatrist Pravin Soni, M.D.*

The ALJ also reviewed the January 29, 2013 psychiatric evaluation of Pravin Soni, M.D., who diagnosed Al-Muqaleh with recurrent major depressive disorder with psychotic features.[10] (Tr. 465-70). Dr. Soni noted that Al-Muqaleh complained of auditory hallucinations, paranoia, feelings of hopelessness, worthlessness, helplessness, and an inability to cope with the functions of daily life. (Tr. 469). He reported sleeping and eating well and did not exhibit any phobias or obsessions. (*Id.*). Dr. Soni also assessed Al-Muqaleh with a GAF score of 45, which the ALJ recognized as "indicative of serious symptoms or any serious impairment of social, occupation, or school functioning." (*Id.*).

---

[10] Although it appears that Al-Muqaleh treated with Dr. Soni for at least two years, his treatment notes are not in the record. The initial page of Dr. Soni's evaluation lists Ali Abdullah, LPC, LMSW as Al-Muqaleh's treating therapist. (Tr. 465). However, Abdullah's treatment notes are also absent from the record.

Here, Al-Muqaleh contends that the ALJ failed to consider Dr. Soni's status as a treating physician, erroneously discounted Al-Muqaleh's GAF score of 45, and failed to consider "the remainder of [Dr. Soni's] report and opinions contained therein." (Doc. # 16 at 18).  The Court disagrees, and finds that the ALJ gave good reasons for giving "limited weight to the low GAF assessment."   (Tr. 17).   First, the ALJ expressly referred to Dr. Soni as "the claimant's psychiatrist," and thus recognized the treating physician relationship.  (Tr. 17).  Second, the ALJ acted within her discretion by discounting Al-Muqaleh's GAF score in light of his "activities, social functioning, and ability to manage financial affairs."  (*Id.*).  Early in her decision, the ALJ referenced Al-Muqaleh's function report in which he indicated that he is able to attend to most all of his personal care needs, goes shopping with a friend "two times per week," goes outside daily, and is able to handle paying his bills and managing his bank accounts.  (Tr. 12, 186-93).  The ALJ also appropriately noted that "Dr. Soni did not explain how the low GAF score impacts [Al-Muqaleh's] day-to-day functioning or ability to work."  (Tr. 17).  Moreover, the GAF score reflected a marked departure from an earlier evaluation performed by psychiatrist Emanuel Tancer, M.D. in February 2011.  At that time, Al-Muqaleh received a GAF score of 60, exhibited logical thought processes, and appeared to be well groomed. (Tr. 262-63).  Third, while the ALJ did in fact discuss the remaining aspects of the evaluation, most of its content simply catalogues Al-Muqaleh's self-reported symptoms without "explain[ing] how the low [GAF] score impacts day-to-day functioning or ability to work." (Tr. 17).  Finally, the ALJ imposed numerous RFC limitations related to Al-Muqaleh's mental impairments, including that he have "only occasional contact with the general public, coworkers, and supervisors, and minimal changes in the work setting." (Tr. 13).

20

      *6.*     *State Agency Psychological Consultant James Tripp, Ed.D.*

Turning to the state agency's psychological consultant, the ALJ properly evaluated the August 24, 2012 mental source statement of James Tripp, Ed.D. (Tr. 46-47, 50-52, 60-61, 64-66). Tripp opined that Al-Muqaleh exhibited mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. 47). He determined that Al-Muqaleh had moderate limitations in understanding, remembering, and carrying out detailed instructions; appropriately interacting with the general public; and responding appropriately to changes in the work setting. (Tr. 51-52). Importantly, Al-Muqaleh had no significant limitations related to understanding, remembering and carrying out short and simple instructions; remembering locations and work-like procedures; maintaining attention and concentration for extended periods; and sustaining an ordinary routine without special supervision. (Tr. 51). Tripp concluded that Al-Muqaleh's mental limitations were mild to moderate with treatment and that he could perform simple, sustained, unskilled tasks with sustainability and persistence. (Tr. 52). The ALJ afforded significant weight to this opinion, although she imposed more restrictive mental limitations in her RFC assessment to account for Al-Muqaleh's "aversion to other people and the need for minimal changes in the work setting due to claimant's difficulty [in] handling change." (Tr. 17).

With respect to Dr. Tripp's mental source statement, Al-Muqaleh maintains that the ALJ should not have given significant weight to his opinion because Dr. Tripp issued the mental source statement before Dr. Soni conducted his January 29, 2013 psychiatric evaluation. (Doc. #16 at 20-21). This argument lacks merit for two reasons. First, as noted above, the Sixth Circuit has held that "[t]here is no categorical requirement that the non-treating source's opinion

be based on a complete or more detailed and comprehensive case record" than that of a treating source. *Helm*, 405 F. App'x at 1002 (internal quotation marks omitted). This is especially true in this case where Al-Muqaleh neglected to submit any other subsequent psychological evidence besides Dr. Soni's evaluation. Second, the ALJ, in any event, gave full consideration to Dr. Soni's subsequent evaluation and properly afforded it limited weight for the reasons discussed above.

In sum, for the reasons stated above, the ALJ's RFC analysis and overall decision is supported by substantial evidence in the record and should be affirmed.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that Commissioner's motion for summary judgment [18] be GRANTED, Al-Muqaleh's motion for summary judgment [16] be DENIED, and the Commissioner's decision be AFFIRMED.


Dated: February 5, 2016                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party

might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 5, 2016.

s/Eddrey O. Butts                        
EDDREY O. BUTTS
Case Manager